UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | |
|---|---|
| IVY L. CATES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 4:10-CV-49 |
| v. ) | |
| ) | *Mattice / Lee* |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Plaintiff Ivy L. Cates[1] ("Plaintiff") was denied disability insurance benefits ("DIB") by the Commissioner of Social Security ("Commissioner" or "Defendant"), and she now appeals that denial.[2] Plaintiff contends the Administrative Law Judge ("ALJ") who heard her claim erred by rejecting the opinion of her treating orthopedic surgeon in favor of a non-examining medical expert's opinion. Plaintiff has moved for judgment on the pleadings [Doc. 10], and Defendant has moved for summary judgment [Doc. 12]. For the reasons stated below, I **RECOMMEND** that Plaintiff's motion for judgment on the pleadings [Doc. 10] be **DENIED**; Defendant's motion for summary judgment [Doc. 12] be **GRANTED**; the decision of Commissioner be **AFFIRMED**; and this action be **DISMISSED WITH PREJUDICE**.

---

[1] When she applied for benefits, Plaintiff was known as Ivy L. Corbin (Tr. 100), and at the time of the hearing, she was known as Ivy L. Maroney (Tr. 1061).

[2] This action is brought pursuant to 42 U.S.C. § 405(g), which provides for judicial review of the final decisions of the Commissioner denying DIB.

## I. ADMINISTRATIVE PROCEEDINGS

In September 2004, at the age of 33, Plaintiff applied for DIB, alleging disability due to neck and back problems, headaches, and pain since June 2001 (Tr. 100-04, 136). Her claim was denied both initially and on reconsideration (Tr. 85-93). Plaintiff requested a hearing, which was held on July 17, 2007 (Tr. 1061-86). At that hearing, the ALJ indicated he was unable to determine the extent of Plaintiff's functional limitations because there were no recent opinions in the record by an examining physician (Tr. 1062, 1082-83). Accordingly, a second hearing was held on November 15, 2007, to take the testimony of a medical expert (1089-1120). In addition, shortly after the hearing, Plaintiff submitted an opinion from her orthopedic surgeon (Tr. 1055). By decision dated January 24, 2008, the ALJ determined Plaintiff was not disabled (Tr. 15-25). When Appeals Council denied Plaintiff's request for review, the ALJ's decision became the final, appealable decision of the Commissioner (Tr. 8-10).

## II. DISABILITY DETERMINATION PROCESS

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The five-step process provides:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

2

> 5) If the claimant can make an adjustment to other work, the claimant
> is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden of proof at the first four steps to show the extent of her impairments, but the burden shifts to the Commissioner at step five to show there are jobs the claimant can perform despite her impairments. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). In order to make the required findings at steps four and five, the ALJ must assess the claimant's residual functional capacity ("RFC"), which refers to the maximum level of work the claimant can perform on a "regular and continuing basis"—i.e., for 8 hours per day, five days per week. Social Security Ruling ("SSR") 96-8p.

## III.   FACTUAL BACKGROUND AND ALJ'S FINDINGS

In this appeal, Plaintiff challenges the ALJ's assessment of her RFC, arguing the ALJ should not have discounted the opinion of Larry M. Parker, M.D., her treating orthopedic surgeon, without first recontacting him for clarification of his opinion. She argues further that the ALJ erred by adopting the opinion of the non-examining medical expert ("ME") because the ME did not take her subjective pain into account. While Plaintiff has had some mental health treatment, she does not allege that the ALJ erred assessing her psychological limitations. This summary of the facts, accordingly, will focus on Plaintiff's treatment for physical impairments and will not recount Plaintiff's mental health treatment except as relevant to her physical complaints.

### A.   Plaintiff's Allegations of Disability

Plaintiff alleges disability due primarily to neck pain, which spreads into her shoulders and arms and causes headaches (Tr. 150, 214-15, 1072, 1077). She had been working as a checker at

3

a grocery store for several years when these symptoms began to affect her activities in January 2000 (Tr. 136). Nevertheless, Plaintiff continued working, albeit with a "lot of time off," until she received surgery in September 2000 (Tr. 136). She returned to work in December 2000, but stopped working again in June 2001 and has not worked since (Tr. 136).

Plaintiff alleges that her neck pain is exacerbated by reaching or repetitive motion (Tr. 199). She alleges she is unable to lift, sit, or stand for any length of time, has frequent headaches, and has problems looking down and driving (Tr. 136, 143-44). Plaintiff stated she was able to take care of her young children by making breakfast, making the beds, washing dishes, and performing some household chores such as dusting and picking up, but she needed help with laundry, shopping, vacuuming, sweeping, and yard work (Tr. 143-46). Her father stated that she was responsible for feeding her dogs and horse, but was no longer able to brush the horse (Tr. 183-86).

### B. Medical Treatment

According to Benjamin Fail, M.D., Plaintiff's primary care physician, Plaintiff "has a long history of spine problems, both cervical and lumbar" (Tr. 679). In December 1991, Plaintiff fell from a horse and suffered a ruptured disc at the L4-5 level (Tr. 222). She was treated conservatively for several years, but her back pain increased during her pregnancy in 1994 (Tr. 222, 492-93). Plaintiff received a laminectomy in July 1995 after she was admitted to the hospital with lumbar radiculopathy (Tr. 222, 224). She also reported severe headaches at that time (Tr. 227). Several months later, she returned to Frank Haws, M.D., with sciatic radiculopathy, and she was diagnosed with another herniation of the same disc (Tr. 288). A second surgery was successful in improving her hip and leg pain (Tr. 322).

In September 1998, Plaintiff had a car accident, which caused headache, low back pain, and

4

tenderness of the cervical spine (Tr. 430). A CT scan showed a "surgical defect" at the site of her previous surgeries and "a few small osteophytes," but no evidence of acute injury (Tr. 433). Plaintiff's cervical spine was "normal," with satisfactory alignment and well-maintained intervertebral disc space height (Tr. 434). In June 2000, however, Plaintiff was admitted to the hospital with pain around her sternum, severe headaches, and numbness, pain, and weakness of her left arm and leg (Tr. 437, 440, 442). Her back pain, which radiated into her left leg, was her biggest complaint, but she was also experiencing discomfort in her neck, left shoulder, and right arm (Tr. 454). An MRI showed two paracentral disc herniations, one at the L4-5 level and another in her cervical spine, at the C3-4 level (Tr. 442). According to the radiologist, the cervical disc herniation "likely results in nerve root compression" (Tr. 448). Another radiological study performed the following month confirmed there was a paracentral herniation at the C3-4 level, with encroachment of neural foramen and displacement of the nerve root, and a "broad based disc bulge" at the L4-5 level (Tr. 458-59). The study also showed another central herniation at the C4-5 level (Tr. 458).

Plaintiff received an orthopedic consultation, which was performed by Morris Seymour, M.D. (Tr. 454-55). Dr. Seymour reported that Plaintiff was "earnest and cooperative" and did not appear to amplify her symptoms (Tr. 454). Plaintiff stated she wanted to continue working, but was having difficulty working even part-time (Tr. 455). Her straight leg raise test was negative in both legs, she was not tender in either the lumbar or cervical spine, and her motor strength was rated 5/5 in both upper and lower extremities (Tr. 455). In September 2000, Larry Parker, M.D., performed an anterior discectomy and fusion at the C3-4 level (Tr. 465, 467-68). Her pain improved for several months (Tr. 498).

In January 2001, however, Plaintiff reported "terrible" neck and arm pain with a constant

headache (Tr. 498). Again in June 2001, she reported headaches, which started in the back of her head and moved to her forehead (Tr. 479-80). Although she had reported migraines in the past, she stated that these were "different" and caused nausea, dizziness, and blurred vision (Tr. 480). At a follow-up appointment with Dr. Parker in July 2001, Plaintiff complained of neck pain, but Dr. Parker observed that the hardware used to perform the fusion was in good position (Tr. 495). She had a moderate limitation on flexion and extension of the neck, but her motor strength in the upper extremities was rated 5+/5 (Tr. 495). Dr. Parker recommended physical therapy and light exercise (Tr. 495). Dr. Parker also opined, in August 2001, that Plaintiff could not perform the repetitive motions of reaching, bending, and twisting of the neck that were required by her job as a cashier (Tr. 496). Dr. Parker also opined that it was "medically probable" that Plaintiff's job as cashier could have caused her symptoms (Tr. 496).

In December 2001, Plaintiff again complained of neck pain, numbness in both arms, and headaches (Tr. 495). Dr. Parker referred her to Roddie R. Gantt, M.D., a pain management specialist who performed facet steroid injections (Tr. 495, 505). Plaintiff later reported these injections "did not help" (Tr. 580). In March 2002, Plaintiff still complained of mechanical neck pain and left periscapular pain, but she had good range of motion in the shoulder and neck, so Dr. Parker recommended a "more concentrated upper extremity exercise program" (Tr. 495). In September 2002, Plaintiff reported she was responsible for caring for her four children, including shopping, cooking, cleaning, and laundry (Tr. 524). She also vacuumed and did yard work, but those chores hurt her back (Tr. 525).

Plaintiff was treated for migraine pain in December 2002 (Tr. 568), and she was treated for a fall in August 2003 (Tr. 613). A radiological study was performed on that latter date, which

6

showed the prior surgery but no fracture, subluxation, disc space narrowing, or any other degenerative changes (Tr. 620).

In May 2003, Plaintiff received a consultative examination by Prem K. Gulati, M.D. (Tr. 580-83). Plaintiff's range of motion in her extremities and dorsolumbar spine was normal, she had no back spasm, and she had no motor or sensory deficit (Tr. 582). In addition, she had no difficulty getting on and off the examination table, squatting and rising, and heel and toe walking (Tr. 582). Her ability to perform both fine and gross manipulations was also normal (Tr. 582). While Plaintiff did have some tenderness in her neck and back, probably with radicular pain, Dr. Gulati opined that she could perform "sitting jobs" without any difficulty (Tr. 583). Dr. Gulati cautioned that Plaintiff would not be able to perform "long-time sitting or long-time standing types of jobs" or "heavy lifting or reaching overhead" (Tr. 583). Also in May 2003, consultative psychological examiner Jon G. Rogers, Ph.D., indicated that Plaintiff's pain was "associated with psychological factors" (Tr. 577). This opinion was echoed in April 2005 by Thomas Pettigrew, Ed.D. (Tr. 838).

In November 2003, a CT scan showed "mild osteophytic encroachment on the right foramen" at the C3-4 level (Tr. 622). There was a small herniation at C4-5, a possible herniation at C5-6, and "a little disc bulging and osteophyte formation" at C6-7 (Tr. 622). Plaintiff did not receive any further treatment at that time, however, reportedly due to a lapse in insurance (Tr. 624). In April 2004, however, Dr. Fail referred her to Saranya Nadella, M.D., for an orthopedic consultation (Tr. 624). Plaintiff reported her pain as an eight on a ten point scale, and Dr. Nadella noted she was "in distress" with neck and arm pain (Tr. 624). By this time, Plaintiff's main complaints were neck and upper extremity pain (Tr. 918). Plaintiff had some "generalized weakness" in her arms, which could have been secondary to pain, but no sensory deficits (Tr. 624). Dr. Nadella recommended that

7

Plaintiff return to Dr. Parker, and Plaintiff indicated she would do so as soon as her insurance was reinstated (Tr. 625).

In January 2005, Plaintiff received a consultative examination by Emelito Pinga, M.D. (Tr. 670-75). Plaintiff complained of back pain, migraine headaches, and ankle pain (Tr. 670). She alleged her headaches occurred two to three times per week and lasted for two hours (Tr. 671). Dr. Pinga noted that Plaintiff gave good effort during the examination (Tr. 673). Plaintiff was able to get onto the examination table, walk normally, and perform a one-foot stand (Tr. 673, 675). A straight leg raising test was negative, and her motor strength was rated 5/5 in all extremities (Tr. 674-75). Dr. Pinga opined that Plaintiff could sit for six hours per day, walk or stand for four hours per day, and could lift five to ten pounds frequently and 15 pounds occasionally (Tr. 675).

That same month, Dr. Fail referred Plaintiff to Joel Pickett, M.D., for evaluation of right-sided low back pain (Tr. 681). Her straight leg rasing test, as reported by Dr. Pinga, was negative, and she was able to move all extremities well with good strength throughout and no sensory deficits (Tr. 681). Dr. Pickett ordered an MRI, which showed an "osteophyte complex" at the C5-6 level causing "mild to moderate central canal and right neural foraminal narrowing" (Tr. 709), and a CT scan showed a small herniation at C4-5 (Tr. 815). A myelogram, however, showed that the nerve roots in the cervical area "filled out very nicely with no evidence of nerve root compression" (Tr. 812, 816). Dr. Pickett saw no reason for surgery and instead recommended exercise and therapy (Tr. 812).[3] Dr. Pickett did, however, administer an injection in Plaintiff's left sacroiliac joint, which provided immediate pain relief of tenderness in that area (Tr. 820). In February 2005, Plaintiff's

---

[3] A lumbar CT scan performed about the same time showed a possible herniation at the L4-5 level, but the radiologist suggested the findings could also be the result of scarring from a previous surgery rather than herniation (Tr. 813).

8

sacroiliac joint pain had "settled down," but she still complained of neck and arm pain (Tr. 821). Her arm strength was rated 5/5, but a sensory examination revealed dysesthetic sensation to light touch in her left hand (Tr. 822). In April 2005, Plaintiff reported she was able to drive independently and perform some household chores and shopping (Tr. 837).

In August 2006, Plaintiff was again referred to Dr. Parker for a consultation regarding her neck and arm pain (Tr. 915-16). Dr. Parker reported that Plaintiff's neck pain had been "progressive" since 2000 and had recently become "debilitating" (Tr. 915). Plaintiff had not received any recent treatment other than pain medication and muscle relaxants, but a physical examination revealed tenderness to palpation and pain throughout her range of motion which was made worse by reaching up or turning her head (Tr. 915-16). Despite her pain, Plaintiff's upper extremity strength in August 2006 ranged from 4+/5 to 5+/5 (Tr. 914, 916). According to Dr. Parker, imaging studies from May 2006 did not show a condition that could account for Plaintiff's reported level of pain, so he ordered another myelogram (Tr. 916). That study showed a significant herniation compromising the exiting nerve root at the C6-7 level and significant osteophyte formation at the C5-6 level (Tr. 914). Dr. Parker performed another cervical fusion in September 2006 (Tr. 919). At follow-up appointments in October and November 2006, Plaintiff had no radiating pain and her strength was again rated at 5+/5 (Tr. 912, 913). Dr. Parker recommended physical therapy and discontinued Percocet, which he had prescribed after the surgery, in favor of a milder pain reliever (Tr. 913). Finally, Dr. Parker noted in November 2006 that he planned to see Plaintiff for a follow-up appointment in three months (Tr. 912), but Plaintiff did not return to see Dr. Parker (Tr. 1085).

### C. Hearing Testimony and Dr. Parker's Post-Hearing Opinion

At a hearing before the ALJ in July 2007,[4] Plaintiff testified she was "not [doing] well" since the 2006 cervical fusion was performed (Tr. 1071). She was taking Lortab, which made her pain "bearable" (Tr. 1071), but she still experienced neck and arm pain, muscle spasms, and headaches (Tr. 1077-78). Plaintiff stated she could drive "some" but did not go shopping, and she needed her family's help with household chores (Tr. 1070). Plaintiff also testified she could not lift anything heavy and had to change positions often due to pain (Tr. 1070-71). She testified she could stand for 30 minutes at a time, but only ten or 15 minutes if she was using her hands and arms (Tr. 1080). She also stated she could walk 100 to 200 feet, but only once during a day (Tr. 1080). Plaintiff testified she needed to lie down approximately two hours per day to alleviate pain (Tr. 1078). Regarding "office type work," Plaintiff testified she would not be able to concentrate because her pain was severe enough to make her "dizzy" on a daily basis (Tr. 1081). Finally, Plaintiff testified she was willing to work, and she acknowledged that some days she could do "a lot" (Tr. 1073, 1083). Nevertheless, she did not believe she would be "dependable," because some days she could do very little (Tr. 1073).

As noted above, the ALJ was reluctant to formulate an RFC assessment based solely on Dr. Gulati's 2003 opinion and Dr. Pinga's 2005 opinion[5] (*see* Tr. 1083). Accordingly, a second hearing was held in November 2007 to elicit the opinion of Allan Levine, M.D., a board-certified orthopedic

---

[4] The transcript of the July 2007 hearing appears to be missing Plaintiff's testimony regarding her treatment by Dr. Parker, but Plaintiff does not challenge the completeness of the record (*see* Tr. 1067-69).

[5] Three non-examining physicians offered fairly non-restrictive assessments of Plaintiff's abilities (Tr. 603-10, 826-33, 892-97), but their opinions were not given significant weight by the ALJ (Tr. 22), nor do they figure prominently in either of the parties' briefs (Tr. 22).

10

surgeon who reviewed the records of Plaintiff's treatment (Tr. 1094-95). At the outset of the examination, the ALJ summarized Plaintiff's testimony from the prior hearing, including Plaintiff's subjective allegations of pain (Tr. 1093-94). Dr. Levine briefly summarized Plaintiff's surgical history and opined that Plaintiff suffered from two medically determinable impairments, chronic low back pain and chronic neck pain (Tr. 1096-97). But in Dr. Levine's opinion, the medical evidence did not show any "current evidence of nerve root or spinal cord compromise" (Tr. 1098). Specifically, Dr. Levine cited imaging studies performed prior to the October 2006 surgery, but then noted that in November 2006, Plaintiff had a normal sensory examination and good motor strength (Tr. 1098). Dr. Levine testified that the recovery period for a cervical fusion was less than a year (Tr. 1100-01). Based on the "objective medical record," Dr. Levine opined that Plaintiff could lift 15 pounds occasionally and ten pounds frequently, but with no above-shoulder lifting, and could sit six hours during a workday, up to 30 minutes at a time, and stand or walk four hours during a workday, but no more than 20 minutes at a time (Tr. 1099). Dr. Levine also offered some postural and environmental restrictions (Tr. 1100).

On cross examination, Plaintiff asked Dr. Levine whether he considered Dr. Nadella's April 2004 report that Plaintiff was experiencing "generalized weakness" secondary to pain (Tr. 1104). Dr. Levine replied, "that's a subjective phenomenon that a patient will exhibit . . . , but it's not an actual motor or neurovascular weakness." (Tr. 1104). Dr. Levine acknowledged that a person's subjective perception of pain may vary with a given impairment, and subjective pain cannot be measured "medically," but Dr. Levine opined that objective findings and Plaintiff's self-reported activities were inconsistent with a level of pain that would support her claimed limitations (Tr. 1106-07). In other words, Dr. Levine offered limitations he believed were supported by the objective

11

evidence, but he did not offer additional limitations based on Plaintiff's alleged level of pain (Tr. 1109).

A vocational expert ("VE") testified that if Plaintiff's testimony were taken as true, including her allegation that she needed to lie down frequently to alleviate pain, there would be no work for her in the national economy (Tr. 1114). Assuming that Dr. Levine's opinion accurately stated Plaintiff's RFC, however, the VE testified that Plaintiff could perform sedentary work which allows alternating sitting and standing (Tr. 1115). According to the VE, such work would include unskilled receptionist, general office clerk, and order clerk, which together would total about 1,900 jobs in the region (Tr. 1116).

During the second hearing, the ALJ summarized his understanding of the evidence. He stated that, given the medical problems experienced by Plaintiff, a hypothetical individual might reasonably be able to do some work, but that it was also possible that Plaintiff might not be able to work (Tr. 1118-19). The ALJ indicated that an opinion from Dr. Parker might help him evaluate Plaintiff's subjective allegations (Tr. 1118-19), so Plaintiff submitted a letter from Dr. Parker after the hearing (Tr. 1055). That brief letter, dated December 6, 2007, is reproduced here in its entirety:

> As the treating surgeon in regards to cervical and lumbar conditions for [Plaintiff], it is my opinion that due to the residual pain, resultant dysfunction, and need for pain medication that [Plaintiff] is not able to work an 8 hour day on a regular basis. Therefore, she would have impairment significant enough to amount to permanent disability in my surgical and medical opinion.

(Tr. 1055).

### D. ALJ's Findings

In January 2008, the ALJ issued a written opinion in which he concluded that Plaintiff was not disabled and had not been disabled for any 12-month period since her alleged onset date (Tr. 15-

12

25). Although he found that Plaintiff had several severe impairments, including degenerative disc disease of the lumbar and cervical spine, status post multiple surgeries, the ALJ found that these impairments did not meet the criteria of any presumptively disabling impairment (Tr. 17). The ALJ explicitly adopted Dr. Levine's opinion as Plaintiff's RFC, declining to give much weight to Dr. Parker's letter (Tr. 22). The ALJ relied on the VE's testimony to find that Plaintiff could perform work existing in the national economy, and therefore was not disabled (Tr. 23-24). The ALJ noted that Plaintiff appeared to have a brief exacerbation of symptoms in 2006, but that these "more severe signs and symptoms . . . were addressed quickly" by Dr. Parker, and Plaintiff was "already improving in less than six months" (Tr. 21).

## IV. ANALYSIS

Plaintiff raises two related issues in this appeal. She argues that the ALJ's RFC finding was not supported by substantial evidence because, first, the ALJ improperly rejected her treating orthopedic surgeon's opinion without recontacting him for clarification, and second, because he adopted the opinion of a non-examining medical expert who did not account for Plaintiff's subjective pain.

### A. Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole,

13

"tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, 2009 WL 2579620, *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived). Nonetheless, the court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

### B. Dr. Parker's Opinion

As the ALJ acknowledged, treating physician opinions are ordinarily entitled to significant, if not controlling, weight (Tr. 22). This is because

> treating sources[] . . . are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's]

14

> medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . .

20 C.F.R. § 404.1527(d)(2). Accordingly, a treating physician's opinion is entitled to complete deference if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original). Even if the ALJ determines that the treating source's opinion is not entitled to controlling weight, the opinion is still entitled to deference commensurate with "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009).

If the ALJ does not give controlling weight to a treating source's opinion, he "must provide 'good reasons for discounting [it], reasons sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (*quoting* SSR 96-7p). Those reasons must themselves be supported by substantial evidence. *Blakley*, 581 F.3d at 406-07. In declining to give any significant weight to Dr. Parker's opinion, the ALJ found that it was "not supported by Dr. Parker's own notes, which reflect no treatment since the reduction of pain medication one year [earlier]." (Tr. 22).

Plaintiff does not directly challenge the adequacy of the ALJ's reason for dismissing Dr. Parker's opinion, but instead argues that the ALJ should have recontacted Dr. Parker to clarify his

15

opinion. As Plaintiff points out, the ALJ "will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved . . . ." 20 C.F.R. § 404.1512(e)(1). According to Plaintiff, "[t]he ALJ apparently felt that Dr. Parker's opinion . . . conflicted with [Plaintiff's] apparent improvement" following her October 2006 surgery [Doc. 11 at PageID #: 28]. This is not the sort of "conflict or ambiguity," however, that is contemplated by the regulation. The regulation requires the ALJ to recontact a treating source only where the evidence received from the source does not provide an adequate basis for determining whether to credit the opinion. *See id.* § 404.1512(e) (agency will recontact when evidence "is inadequate . . . to reach a determination"); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 n.3 (6th Cir. 2009) ("[A]n ALJ is required to re-contact a treating physician only when the information received is inadequate to reach a determination on claimant's disability status, not where, as here, the ALJ rejects the limitations recommended by that physician.").

Here, the ALJ made a determination that Dr. Parker's opinion was not worthy of much weight with respect to Plaintiff's current condition, and that determination was supported by the record. As the ALJ correctly observed, Dr. Parker had not treated Plaintiff since November 2006, at which time his notes indicated that Plaintiff was much improved and no longer needed Percocet for pain. As the ALJ found, Dr. Parker's treatment notes simply do not support his opinion that Plaintiff remained disabled in December 2007 due to "residual pain, resultant dysfunction, and need for pain medication." *See* 20 C.F.R. § 404.1527(d)(2) (opinion entitled to less weight where it is not supportable or consistent with the record as a whole). Notably, the ALJ did admit the possibility that Plaintiff was temporarily unable to work in late 2006 when Dr. Parker performed the cervical fusion. The ALJ therefore did not reject Dr. Parker's opinion entirely, but merely found that it was

16

unsupported to the extent that it assessed Plaintiff's post-recovery condition. In that regard, the ALJ's reasoning had substantial support in the record. Accordingly, I **FIND** that the ALJ had an adequate basis for determining how much weight to give Dr. Parker's opinion and had "good reason" to give it little weight. I therefore **CONCLUDE** the ALJ had no duty to recontact Dr. Parker.[6]

### C. Dr. Levine's Opinion

Plaintiff also argues that the ALJ erred in adopting Dr. Levine's opinion. According to Plaintiff, the ALJ should not have given "determinative" weight to Dr. Levine's opinion because it did not account for Plaintiff's subjective level of pain. Plaintiff makes much of Dr. Levine's admission that he did not base his opinion on Plaintiff's alleged level of pain. As noted above, Dr. Levine testified that "chronic neck pain" and "chronic low back pain" were Plaintiff's two medically determinable impairments (Tr. 1096-97). Dr. Levine testified further that the medical record established that Plaintiff suffered from some level of pain (Tr. 1105). Dr. Levine explained at length, however, that he was not offering an opinion about what Plaintiff could do in spite of her *subjective* pain, but rather what she could do in spite of her objectively verifiable impairments (Tr. 1108-09). Dr. Levine's testimony was based on a "hypothetical individual with similar clinical and objective findings" (Tr. 1095), and he declined to offer atypical restrictions, stating instead that he preferred to "base things on a more objective nature." (Tr. 1109).

Dr. Levine properly declined to base his opinion on Plaintiff's alleged pain because the

---

[6] Had such a duty arisen, moreover, the ALJ could have satisfied it by "requesting copies of [Dr. Parker's] records." 20 C.F.R. § 404.1512(e)(1). Here, there is no indication or argument that the record did not contain all of Dr. Parker's records, and indeed, Plaintiff testified she had not seen Dr. Parker since November 2006 (Tr. 1085).

17

evaluation of pain is a finding entrusted to the ALJ. SSR 96-7p. In making that finding, the ALJ follows a two-step process. First, the ALJ must consider "whether there is an underlying medically determinable . . . impairment . . . that could reasonably be expected to produce the individual's pain . . . ." *Id.* If so, the ALJ must then "determine the extent to which the [pain] limit[s] the individual's ability to do basic work activities"—a determination which requires the ALJ to "make a finding on the credibility of the individual's statements." *Id.* Dr. Levine's testimony was certainly substantial evidence with respect to Plaintiff's objectively verifiable impairments. As the ALJ noted, Dr. Levine "was an "impartial medical expert" with an orthopedic specialty, expert knowledge of Social Security rules and regulations, and a familiarity with the entire record (Tr. 22). *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (weight to which medical opinion is entitled depends on the expert's qualifications, reasoning, reliance on objectively determinable symptoms, detail of analysis, and freedom from irrelevant distractions and prejudices). However, Dr. Levine offered no opinion regarding Plaintiff's credibility. In fact, he expressly declined to offer an opinion that would have required him to find Plaintiff credible. This was not improper. Indeed, it would be a strange rule that requires a non-examining physician to opine on a claimant's credibility.

Credibility, instead, was a finding entrusted to the ALJ. *See* SSR 96-7p. To the extent that Plaintiff's allegations of pain were greater than the pain expected in a "hypothetical individual with similar clinical and objective findings," any additional restrictions could have been based only on Plaintiff's subjective complaints, which the ALJ did not fully credit (Tr. 20). As the Commissioner points out, furthermore, Plaintiff does not challenge the ALJ's assessment of her credibility. Consequently, I **FIND** no error in the ALJ's RFC assessment.

18

## V. CONCLUSION

For the foregoing reasons, I **RECOMMEND:**[7]

(1) Plaintiff's motion for judgment on the pleadings [Doc. 10] be **DENIED**.

(2) Defendant's motion for summary judgment [Doc. 12] be **GRANTED**.

(3) The Commissioner's decision denying benefits be **AFFIRMED** and this action be **DISMISSED WITH PREJUDICE**.

                                            s/ *Susan K. Lee*
                                            SUSAN K. LEE
                                            UNITED STATES MAGISTRATE JUDGE

---

[7] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).